# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

STACY L. ELLIS,

        Plaintiff,

        v.                     Case No. 08-C-0436

HENRY M. PAULSON, JR.
SECRETARY OF THE DEPT. OF TREASURY,

        Defendant.

## MEMORANDUM DECISION REGARDING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 18)
## AND DISMISSING CASE

        Stacy L. Ellis, an Internal Revenue Service employee allergic to mold and dust, refused to relocate from cubicle # 7 (blue area) to cubicle # 18 (red area) within the IRS's Pewaukee office. Ellis requested a reasonable accommodation, and the IRS reassigned her temporarily to the Milwaukee office, paid mileage, parking and travel time, and conducted air quality tests of its Pewaukee office. Initially, Ellis refused to report for duty in the Milwaukee office failing to see how the 25 mile commute was reasonable, and immediately complained of formaldehyde in the carpet when she did report. After Ellis failed to report to work for almost a year and confirmation that there was no formaldehyde in the carpet or unacceptable air quality in the Pewaukee office, the IRS terminated Ellis's employment. For the reasons set forth below, defendant's motion for summary judgment has been granted.

## SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining whether summary judgment is appropriate, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## FINDINGS OF FACT

Ellis began working for the IRS on August 17, 1986, as a tax examiner in Austin, Texas. (Ellis Dep. 16-22.) In April of 1988, Ellis transferred to Wisconsin where she started to work in the Reuss Plaza building in downtown Milwaukee. (*Id.*, at 67.) From 1999 to March of 2002, Ellis worked for the IRS in Waukesha, and from March of 2002 to October of 2003, Ellis worked at home. (*Id.*, at 66.)

On March 19, 2002, Ellis saw Dr. Jordan N. Fink, Chief Allergy/Immunology at Froedert Memorial Lutheran Hospital and Director of Immunotherapy at Children's Hospital of Wisconsin. (Fink Dep. 12; Ex. 7.) She described her complaints to Fink as "fatigue, congestion, blurred thinking, swelling of her neck, occasional sneezing, but no lower respiratory symptoms [and enlarged lymph nodes], at the time of the examination, but Dr. Fink's physical examination of Ellis resulted in a finding that she was normal. (*Id.*,

2

at 13.)  Skin tests revealed that Ellis reacted to multiple molds, pollens, dust, and cat.  (*Id.*, at 14.)  She tested positive for allergies to 30 out of 40 types of mold.  (*Id.*, at 14.)

In October of 2003, Ellis began working in the IRS Pewaukee office, which had three areas described as blue, red, and green.  (*Id.,* at 65, 148.)  The red area is separated from the blue area by two doors and a public hallway.  (*Id.*, at 155.)  Ellis was assigned to cubicle # 7 in the blue area where the Offer-in-Compromise employees worked.  (*Id.*, at 68.)  The Offer-in-Compromise program was based out of Downers Grove, Illinois.  (*Id.,* at 57-56, 67.)

Ellis's husband James, who is also employed by the IRS, worked in the green area of the Pewaukee Office.  (*Id.*, at 148.)  Ellis worked 32 hours a week, eight hours a day, four days a week, and would usually work until 5:30 p.m. or later depending on when she arrived at the office.  (*Id.*, at 89, 90.)

Initially, Ellis's manager was Nella Infusino.  (Kiser Decl., Ex. 2, 3.)  However, Ellis's position with the Offer-in-Compromise Specialists was being centralized resulting in the elimination of her position in Pewaukee.  (Kiser Dep. 11; Kiser Decl., Exs. 2, 3.)  In July of 2006, Ellis became a Tax Examiner to support field Revenue Officers.  (Kiser Decl., Exs. 2, 3.)

On August 21, 2006, Infusino and Joe Heinz from the National Treasury Employees Union ("NTEU") met with Ellis to discuss her job duties and her assigned work location in the Pewaukee office.  (Ellis Dep. 69-71.)  At the time, Ellis's second line supervisor was Bruce Dethmers, Collection Territory Manager for Wisconsin and Northern

Illinois. (Dethmers Dep. 5.) Soon thereafter, Teresa Kiser became the manager of the Pewaukee Office. (Kiser Dep. 12.)

Prior to her reassignment as Tax Examiner, Ellis had not worked within the Collection Field and had not supported Revenue Officers. (Knepel Decl., Ex. 1, 7; Kiser Dep. 27-28.) Her new position required interaction with taxpayers and the posting of taxpayer payments. (Kiser Dep. 28.) Ellis's managers expected that there would be at least three to six months of training involved. (Dethmers Dep. 54; Kiser Dep. 28.) Accordingly, Ellis was assigned a coach, Theresa Memmel, to train her and answer questions. (Dethmers Dep. 54.) At that time, it was anticipated that the blue area would be under reconstruction to accommodate other employees who would be assigned to that area. (Dethmers Dep. 21.)

On September 14, 2006, Ellis told Kiser that she had allergies. (Knepel Decl., Ex. 1, 52.) The next day the NTEU filed a grievance on Ellis's behalf in anticipation of her assignment to the red area. (Knepel Decl., Ex. 1, 26.) On September 19, 2006, Kiser, Ellis's Front Line Manager, gave Ellis a memo stating:

> We're very excited to have a Tax Examiner in Group 16 to assist both our group secretary and our Revenue Officers. Because of your constant interaction with revenue officers we are having you relocate from your current desk into our workspace. We had previously discussed this in a meeting and you had indicated you would prefer working at workstation # 18 (Red). Welcome to the group and please relocate your personal items, files, etc. to workstation # 18 effective Monday, September 25, 2006. MITS has already been notified to move your computer.

(Knepel Decl., Ex. 1, 92.)

4

On September 20, 2006, in response to Kiser's memo, Ellis sent the following

e-mail to Bruce Dethmers:

It is my understanding that you are not in town this week, therefore, I am not able to contact you via phone. When you brought up the issue about me relocating a few months ago to the Collection area, I felt hesitant in discussing my allergies with you. When you were here last Thursday it occurred to me as I was leaving that it would have been a good thing to discuss it with you then but I was not sure how well it would have been received based on the fact the union is involved. I had asked Teresa on the way out how she felt about me talking with you and she encouraged me to do so.

Bruce, I've always had allergies. However, my allergies effect not only my sinuses, they effect my central nervous system. That's what happened to me with the mold in the old office. The allergist/immunologist I saw at the Medical College of Wisconsin tested me for various molds and other allergens. He was adamant that my body was so sensitive I was not to step foot in the old building again. He validated that my excessive tiredness, lightheadedness, and my inability to concentrate was caused by my sensitivity to mold. The testing also confirmed that I have a high sensitivity to dust and my symptoms are identical. On a scale between 1-5 with 5 being highly allergic, I rate as a 5. Paper of all kinds, including cardboard boxes, is the number one producer of dust! The Collection area is contaminated with dust allergens caused by excessive paper and clutter in cubicles, on top of filing cabinets and the storage room where the copy machine is located.

Bruce, when I told Nella that I did not want to move to the area due to my allergies, she laughed at me. I felt offended and humiliated. I panicked and immediately contacted the union. I have to take care of my health to be a productive employee. The memo I received from Teresa yesterday stated that I am to move into cubical # 18 by Monday September 25th. Knowing I would need medical documentation, I made an appointment with my allergist a number of weeks ago for September 27th. It was the soonest I could be seen. Please allow me some time to gather the information you need.

Reflecting on the current and future direction of the organization with most employees working in different cities and

5

even different states from their managers and/or secretaries, in addition to the fact that all Revenue Officers work in the field and/or work flexi place, I do not understand why the location of my work space is relevant.

Please know that I have accepted the changes and the challenges of learning new things these past couple of months and in the future. I have done so based on the fact I have not and will not receive formal training. I have been willing to do whatever I am asked and have done so timely and efficiently from my current location. I have been complimented by Revenue Officers as well as management on the quality of my work and my team spirit. I take tremendous pride in what I do and my professional relationship with you, Teresa, and the Revenue Officers is very important to me.

Thank you for your time and consideration.

(Knepel Decl., Ex. 1, 93-94.)

Bruce Dethmers responded to Ellis's e-mail that same day and stated:

I'm almost certain that we have previously discussed your allergies and I do understand the sensitivity that these irritants create. It is presumptive to assume that the "Collection side" of the building is more prone to allergies than the space in which you currently occupy. Additionally, the re-construction on the "Exam side" (where you currently reside) would likely create the dust issues that you are trying to avoid, thus requiring a move anyway. It would be beneficial for you to move now to avoid any allergic reactions when that construction occurs.

The Group and the Managers are excited about the potential that the addition of someone with your skills can contribute to the overall efficiency and productivity. Your presence in the Collection area is a significant part of your transition to the work that will support the group and the on-going technical assistance you will need.

(Knepel Decl., Ex. 1, 93.)

On September 20, 2006, Kiser responded to Ellis's e-mail as follows:

6

> You stopped in my office today and advised me you would not move until you talked with Bruce Dethmers. He has responded to your concerns. Please be advised we expect you to move into workstation # 18 Monday morning on September 25, 2006. Since you do not work on Fridays, MITs will be moving your computer and related computer equipment to workstation # 18 on Friday, September 22, 2006.

(Knepel Decl., Ex. 1, 93.)

On September 20, 2006, Ellis signed and faxed the request for Reasonable Accommodation Form to the Equal Employment Opportunity Office of the IRS. (Knepel Decl., Ex. 1, 230; Kennedy Dep. 9, Ex. 2.) On the Reasonable Accommodation Form, Ellis described the disability/medical condition requiring the accommodation as follows:

> I suffer from a number of allergies which include a sensitivity to dust, molds, pollen, and cat with the allergy to dust being the current medical condition. In 2002, while working in a previous government office, I suffered many symptoms to the mold allergen. It was confirmed by an allergist that I was strongly allergic to not only mold, but to dust, pollen, and cat. At that time, I was advised to work at home until the office was relocated. I did and my symptoms disappeared.

(Knepel Decl., Ex. 1, 230.) Ellis requested the following accommodation:

> The office was relocated 3 years ago. Since then, I have been working in cubicle blue 7 without any allergy symptoms. I am requesting to remain in cubicle blue 7 or a cubicle in a non red area where my allergies are triggered. My current manager has directed me to move to cubicle red 18.

(Knepel Decl., Ex. 1, 230.) Ellis further stated in the Reasonable Accommodation Request that the requested accommodation would help her perform her job duties as follows:

> The reasonable accommodation request would allow me to perform my job duties without symptoms. Prolonged exposure to any of the above allergens effect my central nervous system. I become fatigued, light-headed and I have a difficult time concentrating. I typically develop symptoms at time immediately or within 30 minutes of exposure.

7

> As stated above, I am highly allergic to dust, mold, pollen, and cat. I have been symptom free for 3 years working in cubicle blue 7. There have been a number of occasion where I have had to spend more than 30 minutes in area red where my manager directed me on 9/19/2006 to move to cubicle red 18 by Monday 9/25/2006. I simply cannot work effectively or efficiently in area red.
>
> I have an appointment with my allergist on September 27, 2006. At this time, I am being told that I have to move by September 25, 2006. I am very concerned for my health. I will be forced to take sick leave unless an extension to gather new medical documentation is given. Please see letter and allergy tests from Dr. Jordan Fink from 2002.

(Knepel Decl., Ex. 1, 230.)

The Reasonable Accommodation Request included a page for Medical Documentation. (*Id.*, at 231.) In the Medical Documentation section, the health care practitioner was requested to provide the diagnoses, "explain the impact of this medical condition on major life activities," "the anticipated duration of this medical condition," and whether the "patient will be able to perform the essential functions of his/her position safely and effectively if the reasonable accommodation he/she has requested is provided." (*Id.*) Ellis did not have the Medical Documentation section completed when she submitted the Reasonable Accommodation Request. (*Id.*) Instead, she included with her request an undated 2002 letter from Dr. Fink, two pages of test results from the Asthma and Allergy Center from 2002, two blank forms and an unsigned medical release form. (Kennedy Dep. 19.)

Ellis's Request for Reasonable Accommodation was assigned to Larry Kennedy, a reasonable accommodation coordinator for the IRS. (Kennedy Dep. 16.)

8

After reviewing the Request, Kennedy advised Ellis that she needed to provide current medical documentation in support. (*Id.,* at 23.)

On September 22, 2006, NTEU filed a grievance on Ellis's behalf based upon her reassignment and relocation without negotiation. (Knepel Decl., Ex. 1, 28-29.) Two days later, on September 24, 2006, Ellis and her husband, James, wiped workstation number 18 in the red area with vinegar and vacuumed the area where she was to report to work the next day. (Kiser Dep. 87; Knepel Decl., Ex. 1, 53.) Ellis said that when she reported to work on September 25, 2006, she felt that her allergies were triggered almost immediately, and she was not feeling well from cleaning the cubicle the day before. (Ellis Dep. 87-88.) According to Ellis, she felt scratchiness in her throat, nasal congestion, "headachy," a "coating" in her throat, and just did not feel good. (Kiser Dep. 88.) Consequently, she sat at her husband's cubicle in the Green Area. (Kiser Decl., Ex. 1, 2251; Allen Aff., Ex. 6, 3.)

Approximately 30-45 minutes after Ellis arrived at work, Kiser asked her why she was sitting somewhere else, and Ellis told Kiser that she was not feeling well. (Kiser Decl., Ex. 1, 2251; Knepel Decl., Ex. 1, 53; Kiser Dep. 90.) Kiser responded that if she was not feeling well, she should go home on sick leave but she was expected to be working at workstation # 18. (Kiser Decl., Ex. 1, 2251.)

At approximately 10:30 a.m., Ellis stopped in Kiser's office and expressed concern about why she was not given flexibility to work at her previous work station until she saw the doctor on Wednesday, September 27, 2006. (Kiser Decl., Ex. 1, 2251; Knepel Decl., Ex. 1, 53.) Ellis asked Kiser if she could work at the group secretary's desk in the red area, but Kiser said she wanted Ellis to work at her own desk. (Kiser Decl., Ex. 1,

9

2251.) At approximately 11:15 a.m., Ellis began working at cubicle # 18 and began training with her coach, Theresa Memmel, to post payments. (Kiser Decl., Ex. 1, 2251.) At approximately 3:15 p.m., Ellis told Kiser that she was not feeling well and would be going home on sick leave. (*Id.*) Ellis states that she was suffering from a scratchy throat, nasal congestion, headachy, and all around, just didn't feel herself. (Ellis Dep. 91.) She also states that the severity of her symptoms increased as the day progressed; she described the severity of her symptoms as probably a three when she arrived at work and a seven by the time she went home. (*Id.*, 92.) She described that her symptoms lasted more than 24 hours and by approximately Wednesday afternoon, she felt completely better. (*Id.*)

On Tuesday, September 26, 2006, Ellis left a voice mail for Kiser and stated that she would be on sick leave through September 27, 2006. (Kiser Decl., Ex. 1, 2251.) Ellis went to see Dr. Fink on Wednesday, September 27, 2006, seeking a "letter" requesting residual accommodation from [her] employer to allow [her] to sit in an area where [her] allergies are not triggered by dust." (Fink Dep., 20.) When Ellis saw Dr. Fink, her physical examination was normal. (*Id.*)

In the early evening of September 27, 2006, Ellis sent an e-mail from the IRS office to Kiser stating that she would be on sick leave on September 28, 2006. (Kiser Decl., Ex. 1, 2251.) On September 29, 2006, Kiser sent an e-mail to Ellis advising that she was required to submit medical documentation for the leave because she had been on sick leave for 26 hours starting at 3:30 p.m. on September 25, 2006, through September 28, 2006. (Kiser Decl., Ex. 1, 2251.) Kiser requested that medical documentation be provided by October 2, 2006. (*Id.*)

10

After Dr. Fink drafted the letter, Ellis reviewed the letter and asked Dr. Fink's office about making corrections. (Ellis Dep. 92.) Ellis made minor clarifications to Dr. Fink's October 5, 2006, letter. (Ellis Dep. 95.)

On October 10, 2006, Ellis left Kiser a voice mail stating that she would be using annual leave that day, and that she expected to have the medical documentation shortly. (Kiser Decl., Ex. 1, 2251.) On October 11, 2006, Ellis sent Dr. Fink a letter advising him that the NTEU President recommended that there were a few parts of his October 5, 2006, letter that needed revision. (Fink Dep., Ex. 6.) On October 12, 2006, Ellis sent Kiser a memo requesting to either move out of the red area or take advanced sick leave and/or retroactive annual leave to September 25, 2006; Ellis submitted a letter from Dr. Fink dated October 5, 2006. (Ellis Dep. 94; Knepel Decl., Ex. 1, 234-236, and Ex. 3, 494-96.)

Dr. Fink's October 5, 2006, letter stated:

To Whom It May Concern:

Stacy Ellis was evaluated in my office on 09/27/06 for workplace environmental illness. Ms. Ellis had been seen by me a number of years ago, was shown to be sensitive to molds, dust, pollen, and cat and was working in a mold contaminated IRS office. She was accommodated by allowing to carry out her work at home, which she did, apparently to IRS satisfaction between 4/02 and 10/03.

In 10/03, she moved to new space in the "Blue" area of the now IRS Waukesha office where she carried out her position from 10/03 to 9/25/06. On 9/26/06, she was moved from her cubicle in the "Blue" area to a cubicle in the "Red" area. Almost immediately, her old symptoms returned. She had respiratory congestion, fatigue, "blurred thinking," swelling of her neck area, aching of her ears but no lower respiratory symptoms. She felt well when she was out of the "Red" office space area. She noticed that nearby the "Red" area office

11

were multiple dirty cardboard boxes and paper files. She wondered if some of the boxes had come from the original mold contaminated IRS office (Vide Supra).

In essence, Ms. Ellis had multiple symptoms of "sick building syndrome" and allergy in a previous IRS office shown to be mold contaminated. These symptoms were relieved by 1) initially having her work at home and 2) by moving her to a new cubicle in the Waukesha IRS office. Following a move into another cubicle ("Red") her symptoms have all returned.

Based upon her previous and current history, Ms. Ellis has symptoms related to her workplace.

My suggestions for accommodation:

1.      Return Ms. Ellis to her former "Blue" cubicle or another "Blue" cubicle in the Waukesha IRS office.
2.      or Move Ms. Ellis to the "Green" area in the Waukesha IRS office where she has spent some time without symptoms.
3.      or Engage an Independent Certified Industrial Hygienist to conduct a survey of the "Red" area for mold, particles, volatile organic chemical (metabolites of mold) or other irritants and remediate the area.
4.      or Assign Ms. Ellis to her home were she has previously worked without symptoms. She may need various equipment to function at home.

I would hope that you could accommodate Ms. Ellis by me in more of the above measures so that she could continue to be a productive Federal employee without any disability.

(Knepel Decl., Ex. 1, 235-36.)

On October 13, 2006, Larry Kennedy advised Teresa Kiser that Ellis had filed

a Reasonable Accommodation Request. (Kiser Decl., Ex. 1, 2252.) After attempting to

contact Ellis by telephone, Kiser sent Ellis a letter dated October 13, 2006, that advised

Ellis of the following:

As Tax Examiner you need to provide support to the revenue offices in group 16. This will entail constant interaction with the

12

revenue officers and will require you to be in the "red area" on a continual basis. Since it may take quite some time before we have our doctor's opinion which may or may not require testing of the entire building, we think it is your best interest to be temporarily reassigned to our downtown office at 211 E. Wisconsin Avenue effective Monday, October 16, 2006.

Your request for advance sick leave is denied at this time pending the evaluation to be done by Dr. Presant.

(Knepel Decl., Ex. 1, 52, 54, 237-38.)

On October 13, 2006, Kennedy requested that the FOH provide a medical assessment of Ellis. (Kennedy Dep. 26, Ex. 4.) FOH employees are not IRS employees, but are contracted by the IRS to provide an independent assessment. (Kennedy Dep. 11.) The FOH was asked to provide the following information:

☐     Whether the employee has a medical condition that substantially limits a major life activity
☐     What the major life activity is and how it related to the employee performing essential job duties
☐     **If it is determined that the employee has a medical condition that substantially limits a major life activity, provide medically based recommendations** that might effectively accommodate the individual (given the limitations and restrictions of the medical condition).

(Kennedy Dep., 26., Ex. 4.)(emphasis in the original). The FOH was also advised that the manager/deciding official would "make the decision on granting or denying the RA request as well as what specific accommodation(s) will be provided based on all available information." (Kennedy Dep. 26, Ex. 4.)

The information submitted to FOH was an October 12, 2006, memo from Larry Kennedy, indicating that the medical documentation indicated that Ellis suffered from severe allergies and "sick building syndrome" and that Ellis and her doctor have stated that

13

relocation to a "non-red" work area would be beneficial to her health. (Kennedy Dep. 26, Ex. 4.) Kennedy also reiterated the following concerns of management:

1. Ms. Ellis has been able to attend group meetings in the "red" area that have lasted approximately four hours each day without any apparent ill effects;

2. Ms. Ellis is currently in a new position that requires closer supervision because she in a training mode, and the position also requires constant interaction with other members of her work group;

3. The three work areas in the building (blue, green and red) are all on the same floor and essentially open to each other.

(Kennedy Dep. 26, Ex. 4.) Kennedy also stated in the memo to the FOH that management felt that it was unlikely one area that would be contaminated with mold, dust or pollen than any other area in the office. (*Id.*) The memo added "Management further states that no other employees have indicated similar problems as Ms. Ellis has reported in the workplace." (Kennedy Dep., 26, Ex. 4.) A copy of the Reasonable Accommodation Request was included along with the signed release permitting the FOH physician to talk with Dr. Fink. (Kennedy Dep. 26, Ex. 4.) However, Kennedy did not forward Dr. Fink's 2002 letter or the 2002 allergy test results because the information was not current. (Kennedy Dep. 23.) Additionally, Kennedy advised Ellis that she needed to provide current medical information in support of her Reasonable Accommodation Request but he did not explain the word "current." (Kennedy Dep. 20-24.)

Despite being directed to report to work at the downtown Milwaukee office of the IRS on October 16, 2006, Ellis failed to report to duty. (Knepel Decl., Ex. 1, 239.) The next day, a letter dated October 18, 2006, and signed by Jack Haenlein on behalf of

14

Bruce Dethmers was delivered to Ellis advising that her failure to report for duty and continued absence would result in a charge of Absence Without leave (AWOL). (Knepel Decl., Ex. 1, 239.)

On October 18, 2006, Ellis submitted a memo directed to "To Whom It May Concern" requesting 30 days advanced sick leave retroactive to September 25, 2006, with an October 18, 2006, letter from Dr. Fink. (Knepel Decl., Ex. 1, 240-241; Fink Dep. 44.) Dr. Fink authored the letter to help Ellis obtain advance leave. (Fink Dep. 44-45). The letter states:

> This is written as an addendum to my letter of October 5, 2006 regarding Stacy Ellis['s] workplace medical problem.
>
> Ms. Ellis has informed me that she has earned sick leave and is requesting 30 days of advanced sick leave. This is done to 1) allow her health to improve and 2) allow a response to my request for accommodations for her. I also am aware that she had no symptoms when working in the "Blue" or ["]Green" areas of the Waukesha/Pewaukee office. I am not aware of the environment of the Milwaukee office and what effects that office might have on her symptoms. I would therefore recommend that she work in the "safe" areas of the Waukesha/Pewaukee office while environmental investigations and any accommodations necessary be carried out. If this cannot be done, I would ask that she be given advanced sick leave until the environmental problem is resolved.

(Knepel Decl., Ex. 1, 242.)

On October 19, 2006, Kiser sent a letter to Ellis denying her requests for sick leave and advanced sick leave stating, in part, that Dr. Fink's October 5, 2006, letter and his addendum of October 18, 2006, did not justify the use of sick leave nor Ellis's request for advanced sick leave. (Knepel Decl., Ex. 1, 242.) The letter advised Ellis that she would be reported AWOL for the period October 16, 2006, through October 19, 2006, because

15

the request for leave was denied and Ellis did not report to the Milwaukee office on October 16, 2006. (Knepel Decl., Ex. 1, 242.) Kiser also advised in the October 19, 2006, letter that Ellis was directed to report to the Milwaukee office on October 23, 2006, to Memmel, her coach, and to continue training regarding her new job duties. (*Id.*) In addition, Ellis was informed that she was permitted to claim mileage and parking, as well as commuting time. (*Id.*) Kiser further advised Ellis that her detail to the Milwaukee office was temporary until the office testing could be completed and analyzed and the detail would permit Ellis's "continued development as a Tax Examiner during this temporary period." (*Id.*)

On October 23, 2006, Ellis faxed a letter dated October 22, 2006, to Kennedy indicating, in part, that traveling to the Milwaukee office was not a reasonable accommodation that was in her best interest and stating:

> Attached please find a letter dated October 19, 2006[,] that I received certified on Friday October 20, 2006[,] from Teresa Kiser.
>
> Once again, she is discounting my doctor's recommendation without giving me a logical and reasonable explanation as to why I am not allowed to work in the Waukesha/Pewaukee office and/or why she is not granting me advanced Sick leave. I'm having a very difficult time understanding how sending me to the Milwaukee downtown office, at the government's expense, is a reasonable accommodation in the interim. <u>Area Red is separate and distinct from areas Blue and Green in the Waukesha/Pewaukee office.</u> I have worked in Area Blue and was constantly in and out of Area Green for 3 years without symptoms.
>
> I live 25 miles from the Milwaukee office. I will be reporting to that office on a "detail" beginning Monday October 23, 2006. My doctor has clearly determined that I have a disability. I am baffled as to why the government is willing to pay me to drive 50 miles a day, reimburse me for parking, and give me time to drive to and from the office when I could work in Areas Blue or Green in the Waukesha/Pewaukee office at no cost to the

16

government. The government is also going to pay Teresa Memmel, my coach, whose Post of Duty is the Waukesha/Pewaukee to travel and park at the downtown Milwaukee office. Teresa Memmel and I have worked together for over a month in the Waukesha office while I was assigned to cubicle Blue 7. In cubicle Blue 7, I successfully completed supportive activities for Collection Group 16 that improved productivity and met business goals and objectives. There is nothing in my drop file that suggests otherwise. I have been a respected and loyal employee of the Internal Revenue Service for 20 years who has had perfect evaluations for the past 5 years.

Traveling to downtown Milwaukee is not a reasonable accommodation in the interim that is in my best interest nor the best interest of the government.

(Kennedy Decl., Ex. 4.)

On October 23, 2006, Ellis reported for work at the Milwaukee office. (Kiser Decl., Ex. 1, 2252.) Two days later, at 5:05 p.m., Ellis sent Kennedy an e-mail stating that she was feeling worse in the Milwaukee office than in the Waukesha Office. Ellis stated as follows:

> I'M WRITING TO LET YOU KNOW THAT I HAVE BEEN WORKING IN THE DOWNTOWN MILWAUKEE OFFICE SINCE 10/23/06. SADLY, I FEEL WORSE HERE THAN IN THE WAUKESHA OFFICE. I'M SENSITIVE TO THE FORMALDEHYDE IN THE NEW CARPETING. I'VE EXPERIENCE[D] THIS SENSITIVITY BEFORE BUT I DIDN'T THINK I NEEDED TO WORRY ABOUT IT SINCE THE IRS MOVED INTO THIS BUILDING IN APRIL. I'M VERY LIGHT HEADED, MY EARS HURT, AND MY LYMPH NODES ARE SWOLLEN IN MY NECK. I FEEL LIKE I HAVE A COATING IN MY THROAT AND MY NOSE IS CONGESTED. I COULDN'T EVEN TASTE MY MEAL LAST NIGHT.
>
> I SAW MY DOCTOR TODAY AND HE WANTED TO SEE ME. I ASKED HIM IF THEY COULD GIVE ME A BLOOD TEST OR SOMETHING TO PROVE I'M REALLY SICK. UNFORTUNATELY, HE SAID THERE IS NO SUCH TEST. HE IS VERY FRUSTRATED THAT THEY ARE NOT

HONORING HIS LETTERS.  WHEN I CALLED TERESA TO TELL HER THAT I HAD A DOCTOR'S APPOINTMENT THIS MORNING SHE SAID SHE WANTED ME TO SEND HER DOCUMENTATION OF THE APPOINTMENT. I WILL FAX IT TO YOU TOMORROW.  I TOLD HER I WAS REACTING TO THE NEW CARPETING AND SHE SIGHED LOUDLY IN THE PHONE AND SAID, "WHATEVER."

NELLA INFUSINO, THE MANAGER WHO IS OVERSEEING ME IN MILWAUKEE, WAS TOLD BY THE UNION YESTERDAY THAT I WAS FEELING VERY SICK HERE. HER RESPONSE WAS TO TAKE BREAKS AND WALK IN THE MALL TO GET AWAY FROM THE CARPETING! DOESN'T HELP ME MUCH.

I DON'T KNOW WHAT TO DO.  I CAN'T EXPRESS IN WORDS HOW SICK I FEEL BOTH PHYSICALLY AND EMOTIONALLY ABOUT THIS WHOLE SITUATION WHEN IT COULD EASILY BE RESOLVED.   PLEASE PLEASE HELP ME!

I DO NOT HAVE ACCESS TO THE VM ON THE PHONE WHERE I'M SITTING SO IT IS BEST TO REACH ME VIA EMAIL.

(Kennedy, Ex. 5.)

At 5:18 p.m. that same day, Ellis sent e-mails to Kiser and Dethmers stating:

I feel worse in this building than in the Waukesha-Red Area. I am sensitive to the fomaldehyde in the new carpeting.  I've experienced this before.  My doctor wanted to see me today. He is concerned and frustrated that you have not honored his letters.  He told me there is nothing more he can do for me.

I am very sick Teresa.  I am trying to make this work!  I have been here 3 days and the more I expose myself to the formaldehyde, the more saturated my system becomes, the sicker I feel and the longer it takes before I will feel better.  It will take the weekend and then I'm back on Monday to start the process all over again.  I am light headed and my lymph nodes are swollen in my neck.  My throat feels like I have a coating, and my ears are aching.  I couldn't even taste my meal last night.  There is no drug to help me.  This is my body and I can't change it.  I don't know what else to do.

18

> Please help me!

(Kiser Decl., Ex. 3)

On Thursday, October 26, 2006, at 10:33 a.m., Ellis sent an e-mail to Kennedy stating:

> I have forwarded to you an e-mail I sent to Teresa and CC'd it to Bruce Dethmers last night.
>
> Also, as a side note, it occurred to me on my way into the office today that the main reason I worked without symptoms sitting in Cubicle Blue 7 for 3 years is the fact that I had a vent above my head that blew in fresh air from the outside on a continuous basis. I know this for a fact because last winter I put a trouble ticket in for the vent to be altered so it wouldn't blow on me. I was very cold and thought that the air conditioning was kicking in. When building maintenance came by, []he explained to me that he could alter the direction of the air from the vent however there was no way to turn it off because it was vital to the air ventilation in the area. I never complained again. I would always wear a sweater or my coat. I was just happy to have the fresh air to breathe daily.
>
> When I mentioned to Dr. Fink yesterday that I was working in new carpet, the first thing he said was "FORMALDEHYDE." He said the only way I could get away from it is if I threw a chair through the window.

(Kennedy Decl., Ex. 6.)

At 10:41 a.m., Kennedy forwarded the e-mail from Ellis to Kiser and stated that "[t]he vent thing might not only be legitimate, but a solution if there is a cubicle in the 'Red' area that has a similar configuration," and asked Kiser her thoughts. (*Id.*, at Ex. 7.)

At 11:19 a.m., on October 26, 2006, Kiser sent Ellis an e-mail and offered as follows:

> I talked with Larry Kennedy this morning and he shared with me your concerns/comments about the vent being near your former workstation in the blue area. The air vent in the blue area covered four workstations. I looked at the vents in the "red" area. Workstation # 18 has two vents: one in the

19

> workstation to the left and one in the workstation to the right. We would be willing to submit an ERC ticket to have the air flow redirected near workstation # 18 provided Dr. Fink releases you to work in the "red" area. Does this sound acceptable to you while we are awaiting our evaluation by our doctor and air testing to be done in the Pewaukee office?

(Kiser Decl., Ex. 3)

On October 26, 2006, at 12:44 p.m., Kennedy responded to Ellis via e-mail

as follows:

> Just wanted to let you know that I am in receipt of your e-mails. I have been in contact with FOH, REFM, and management and have been trying to expedite the processing of your case. I have [been] working on getting an air quality test for the Waukesha office to determine the levels of mold and pollen presant [sic] in that office, and to determine what options management would consider acceptable to resolve your issues. As soon as I got your message regarding the vent in the blue area, I contacted management to see if there was a similarly situated cubicle in the red area. Hopefully you will have received a proposal from management regarding a suggestion I made to them. As soon as I have something of a substantive nature to report, I'll let you know as soon as I get it.

(Kennedy Decl., Ex. 9; Knepel Decl., Ex. 1, 245.)

At 4:09 p.m., on October 26, 2006, Ellis responded:

> Thank you for getting back with me with the update. My message to you about the vent in Blue 7 was misunderstood. My realization was simply a "guess" as to why I may have felt better in Blue 7. Until the air testing is complete, my doctor will not allow me to work in Area Red. Please know that the testing should be for MOLDS and DUST ---- NOT POLLEN as you stated. Please be sure that the test orders are correct.

(Kennedy Decl., Ex. 10; Knepel Decl., Ex. 1, 246.)

On October 31, 2006, Dr. James Allen in his report stated as follows:

Dear Mr. Kennedy:

20

The above employee requests a reasonable accommodation due to her medical condition involving her allergies. She is requesting that she not be forced to move to cubicle red 18. I've reviewed the following documentation:

• Reasonabl[e] Accommodation, form 13661, Part I signed by Stacy Ellis dated September 21, 2006
• Medical letter signed by Jordan N. Fink MD dated October 5, 2006
• IRS Memo dated October 12, 2006 signed by yourself
• Medical Release for Jordan N. Fink signed by Stacy Ellis dated October 9, 2006

On October 30, 2006 I discussed this employee's medical condition with Jordan N. Fink MD, a specialist in allergy.

1. Diagnosis identifying the physical/mental disabilities

Dr. Fink is treating Ms Ellis for environmental illness related to exposures in her work area. The physician notes that her medical condition improved in April 2002 when she worked at home. Dr. Fink wrote in his letter of October 5, 2006 based on the employee's self-reports of symptoms. The physician believes that the employee report of symptoms is a repeat of her exposure from 2002.

I did not receive any information on specific medical testing of the employee or indoor air quality results from the building that would suggest the nature of the allergies described by Ms Ellis.

2. Prognosis interpreting what the disability is an[d] the expected duration

I discussed with Dr. Fink the workplace observations related to your IRS memo of October 12, 2006. Specific topics of discussion were the employee's attendance in the red area without symptoms and the apparent mixing of air

21

in the blue, green, and red areas. Dr. Fink could not explain why Ms Ellis reports symptoms in the red work area for assigned work tasks but not for training tasks or under other situations.

Dr. Fink has seen Ms Ellis four or five times in October. Specific prognosis was not available.

3. A medical opinion as to options/alternatives available to accommodate the individual given the limitations and restrictions of the disability

At this time I'm unclear about the nature of the employee's impairment, if any. Management may wish to ask the building manager to verify the quality of the indoor air in the blue, red, and green work areas. Other helpful information would be the nature and frequency of other employees' complaints about the indoor air quality.

I'm available to review any additional medical documentation that this employee may provide.

If you have questions, please contact me.

(Knepel Decl., Ex. 1, 248-49.)

On October 31, 2006, Kiser sent Ellis an e-mail advising her that Betty Gallagher, the Safety Officer, told her that the carpet did not contain formaldehyde and that adhesive was not applied when the carpet was laid. (Kiser Decl., Ex. 3 p. 8; Knepel Decl., Ex. 1, p. 94, 250-54.) Ellis worked in the Milwaukee office from October 23, 2006, to November 3, 2006. (Kiser Decl., Ex. 2, 4.) Ellis did not return to work at the IRS after November 3, 2006, and was charged AWOL from November 6, 2006, until she was terminated in October 2007. (Kiser Decl., Ex. 2, p. 5.)

In a memo to Kiser dated November 3, 2006, Ellis sets forth a history of her complaints and problems and further states that "[f]or health reasons, I can no longer

22

return to the downtown Milwaukee office and I cannot sit in the red area of the [Pewaukee] office." (Knepel Decl., Ex. 1, 258-59.) She also stated that "[w]hatever the air quality report states will NOT change the fact that I have a disability verified by Dr. Jordan Fink and that I get sick in the Red area of the Waukesha office." (Knepel Decl., Ex. 1, p. 258.) Ellis added that she wants to do her job, but that Kiser has put up "roadblocks," and her requests for advanced sick leave were denied even though her doctor provided the "required medical documentation." (Knepel Decl., Ex. 1, 259.) In addition, Ellis wrote that she was unfairly charged leave without pay and absence without leave for no good reason. (Knepel Decl., Ex. 1, 259.) Again, Ellis requested to sit in the blue or green area, or alternatively for reconsideration of her request for advanced sick leave or advanced annual leave, and further stated that if her request is denied, that she was left "with no alternative but to not return to work." (Knepel Decl., Ex. 1, 259.) Ellis asked for a written response, and advised that if Kiser wanted to discuss the issue, that Kiser should contact Ellis's union representative, Renee Haas. (Knepel Decl., Ex. 1, 259.)

On November 3, 2006, Ellis also sent a letter to Dr. Allen, describing her situation, symptoms, her allergy problems in 2002, with a copy of Dr. Fink's October 18, 2006, letter. (Knepel Decl., Ex. 1, 260-61.)

On November 7, 2006, Kiser sent Ellis the following letter stating, in part:

In response to your letter dated November 3, 2006 in which you state "For health reasons, I can no longer return to the downtown Milwaukee office and I cannot sit in the Red area of the Waukesha office."

You also state that your request for advanced sick and your request to use annual leave and time off award in-lieu of sick leave were denied. Your requests for advanced sick leave and annual/time off award leave in lieu of sick leave were granted

23

in accordance to the National Agreement Article 34 Sections 2, 3, and 4.

In an effort to assist in your request for reasonable accommodations you were temporarily assigned to the Milwaukee office. Since being temporarily reassigned to the Milwaukee office you have expressed concerns about the carpeting in the office allegedly containing formaldehyde, a substance that you contend is causing you allergic reactions. We have verified with our safety officer regarding your concern and thereafter advised you on October 31, 2006 that the carpeting in our Milwaukee office does not contain formaldehyde nor was there any other substance (i.e., adhesive) used when installing.

(Knepel Decl., Ex. 1, 262-64.) Ellis was advised that she was being reported AWOL for November 6 and 7, 2006, that future similar absences would be reported as AWOL, and that continued AWOL may result in adverse action, up to and/or including removal. (*Id.*) Kiser reiterated in the letter that Ellis's detail to Milwaukee was temporary until office testing activities could be completed and analyzed. (*Id.*)

On Monday, November 13, 2006, Ellis reiterated that for health reasons, she would not be reporting to work until she was permitted to work in an environment where she felt healthy. (Knepel Decl., Ex. 1, p. 99.)

On November 20, 2006, the Industrial Hygienist for the General Services Administration ("GSA") conducted air quality testing that included testing for mold and dust at the Milwaukee office of the IRS. (Knepel Decl., Ex. 1, 279.) The test results revealed no significant mold levels and the dust testing was well below the permissible exposure limit for dust. (Knepel Decl., Ex. 1, 279.)

On November 21, 2006, the Industrial Hygienist for the GSA conducted mold, dust, and air quality testing at the Pewaukee Office of the IRS. (Knepel Decl., Ex. 1, 270.)

24

The test results reflected no significant mold levels and that there were no health hazards in regard to mold. (*Id., at 271.*) In addition, the tests showed that the dust samples taken in and around Stacy Ellis's work area were well below the value for permissible dust. (*Id.*) The Industrial Hygienist noted that the ceiling air-handling filters appeared to be clean, and that the carbon dioxide level in cubicle # 18 was 891 parts per million (PPM). (*Id.*, at 270, 276.) The carbon dioxide levels in cubicle # 7 were only 768 PPM. (Knepel Decl., Ex. 1, 270-278.) In areas 10 and 20 the carbon dioxide level was over 1000 PPM (*Id.*, at 276.) The GSA carbon dioxide standard for office buildings was 1000 PPM. (*Id.*, at 270.) The report recommended that more outside fresh air should be brought in through the air handling system. (*Id.*)

On December 20, 2006, the written results were issued. (*Id.*, at 279; Kiser Decl. Ex. 3, 10.) The GSA air quality report stated: Studies have shown that, at $CO_2$ levels above 800 parts per million, IAQ complaints tend to increase. (Knepel Decl., Ex. 1, 270-278.)

On January 10, 2007, Kiser sent the plaintiff a letter stating:

Reference is made to your letter dated November 3, 2006 in which you state "For health reasons, I can no longer return to the downtown Milwaukee office and I cannot sit in the Red area of the Waukesha office".

In an effort to assist in your request for reasonable accommodations you were temporarily assigned to the Milwaukee office. After working in the Milwaukee office you expressed concerns about the carpeting in the office allegedly containing formaldehyde, a substance that you contend is causing you allergic reactions. We advised you by letter dated October 31, 2006 that we had verified through the manufacturer the carpeting in our Milwaukee office does not contain formaldehyde.

25

> We have now received the results of air quality testing done by the General Services Administration Industrial Hygienist, for both our Milwaukee and Pewaukee offices and they revealed no health hazards. The mold and dust results were well below acceptable levels contrary to your contention. Attached is our denial of your Reasonable Accommodation Request. As your manager, I'm directing you to the Pewaukee office (workstation #18) effective Tuesday, January 16, 2007.
>
> I am concerned about your personal well being, but cannot authorize you to be away from the office when your reasons do not include supporting documentation to justify the absence. You have refused to and have been charged Absent Without Leave (AWOL) since October 15, 2006. You need to know that continued AWOL may result in adverse action, up to and/or including removal.
>
> Your job is very important to Collection's operation. Your work addresses important support activities that are critical to improving productivity and delivery of business goals/objections. Your absence negatively impacts your development and the accomplishments of the office.
>
> If you are experiencing a personal difficulty, I encourage you [to] make use of our Employee Assistance Program (EAP) at 1-800-977-7631.
>
> If you have any questions please feel free to contact me at 262-513-3505.

(Knepel Decl., Ex. 1, 265-68.) Kiser also included the Denial of Reasonable Accommodation Request form which stated that plaintiff's Reasonable Accommodation Request was being denied because the medical documentation was inadequate, that continued seating away from the group negatively impacted the workload, that the air quality testing revealed no health hazards relating to mold and that the dust sample results were well below acceptable levels. (*Id.*, at 67.) The letter added that:

> Ms. Ellis was reassigned to a workstation in the red area of the Pewaukee office to support revenue officers. She had requested workstation # 18 but refused to work in this location

26

> after her reassignment. Ms. Ellis was directed to work in our
> Milwaukee office pending testing to be done in the Pewaukee
> office. During this period she was allowed commute time,
> reimbursed for mileage and for parking. She worked in the
> Milwaukee office for two weeks and then refused to return to
> work in either the Milwaukee or Pewaukee offices. We also
> offered to direct vents toward Ms. Ellis' workstation in the red
> area of the Pewaukee office and she still refused to work in
> that area.

(*Id.*, at 267.)

On January 16, 2007, Ellis wrote in an e-mail memorandum to Kiser that her relocation to the Milwaukee office was a "great cost to the Department and great hardship for me, [and] did not relieve me of my allergy symptoms." (Kiser Decl. Ex. 3, 11.) Ellis described that she had to travel 50 miles each day for work and her coach had to also be reassigned to Milwaukee. (*Id.*) Ellis further stated that "[a]ir vents repositioned so that they blow on me will not dispel the allergens that cause my symptoms." (*Id.*) Ellis stated that based upon her letters starting on November 3, 2006, and the supporting documentation from Dr. Fink, her "disability prevents [her] from working in the Red Area of the Pewaukee office and until a reasonable accommodation is provided I cannot report to work. " (*Id.*) She further advised that she "filed a formal complaint with EEO Counselor Toni Jacobi regarding your failure and denial of a reasonable accommodation." (*Id.*) In addition, Ellis stated that if specific information was necessary, her supervisors should contact her "with a written request of that information and I will have my doctor provide you with it." (*Id.*, at 136.)

Dethmer and Dorothy Bischoff contacted the FOH doctor to obtain assistance regarding specific medical information they may need to request and also to share the air

quality information with the FOH doctor so that the doctor could "discuss with Dr. Fink in an effort to determine what needs to be done in the 'red area' to accommodate Stacy." (Kiser Decl. Ex. 3, 13.) Consequently, Dr. Allen talked with Dr. Fink on January 31, 2007. (Knepel Decl., Ex. 3, 513.) Dr. Allen issued his report that day as follows:

> In my letter of October 31, 2006[,] I suggested that management ask the building manager to verify the quality of the indoor air in the blue, red, and green work area. The building manager completed the testing on November 21, 2006. I've reviewed the indoor air quality survey, including mold, total dust, and indoor air. All tests were within accepted limits except for $CO_2$ level which were above 1000 PPM in areas 10 and 20. This limit on $CO_2$ is indicative of a need for increased ventilation and not of toxicity. On January 31, 2007, 2007[,] I contact[ed] Jordan N. Fink MD, a specialist in allergy to discuss the results of the air survey. Dr. Jordan has not seen Ms. Ellis in more than a month. He has assumed that her symptoms were resolved. He was interested to learn about the air quality in the employee's work area.
>
> Dr. Fink had seen Ms[.] Ellis four or five times in October. I'm uncertain about the significance of her failure to return to his office.
>
> The building manager will be modifying the air handling system to bring in more outside fresh air. This will help bring the $CO_2$ levels down. From a medical perspective, I concur with this approach.
>
> The industrial hygiene and medical information I have reviewed indicates that the areas outlined in the indoor air quality survey are suitable for an office environment. I find no medical basis for this employee's assertion that her work area is unhealthy.
>
> If you have any questions, please contact me.

(*Id.*)

On January 31, 2007, Dethmers advised Kiser to proceed with drafting Kiser's recommendation for termination. (Kiser Decl. Ex. 3, 14.)

28

On February 2, 2007, Kiser prepared a lengthy memorandum to Dethmers wherein she recommended that plaintiff be terminated, she provided a detailed history of the case which included a summary of Dr. Allen's conclusion that "[t]he industrial hygiene and medial information . . . [he had] reviewed indicates that the areas outlined in the indoor air quality survey are suitable for an office environment, [and that there was] no medical basis for this employee's assertion that her work area is unhealthy." (*Id.*, at Ex. 1.)

That same day Dethmers recommended termination of Ellis to Bischoff in Labor Relations and stated:

> Essentially, our efforts to get the employee to return to work have been unsuccessful. We have taken appropriate precautions to ensure that we are not jeopardizing the employee's physical well-being by mandating this move into the Collection work area of the Pewaukee office. Air quality testing has been negative and our (Government's) doctor is not able to determine what the employee is being treated for through her doctor. To our knowledge, there are no medications being dispensed to alleviate any of the employee's alleged symptoms.
>
> In conclusion, the Service has a right to move the employee. We have address[ed] the Reasonable Accommodation issue through manufacture research and air quality testing to determine that we are providing a safe work environment for the employee to work. Informal discussions with GLS indicate that our actions/decisions were appropriate. And lastly, our effort to convince the employee of the above and return to work have been unsuccessful. The employee's absence from the 2nd Step grievance process seems to be indicative of her lack of interest in negotiating and/or resolving the problem.
>
> The employee has abandoned the job and therefore I recommend that we proceed with Termination action.

(Kiser Decl., Ex. 3, 17.)

On February 8 and February 9, 2007, the GSA performed a second indoor air quality survey of the Milwaukee office temperature, relative humidity, carbon monoxide, carbon dioxide levels and possible mold contamination from several window locations. The carbon dioxide levels during these testing dates were within the GSA indoor air quality standards and no significant mold spores were observed. (Knepel Decl., Ex. 1, 288, 293.)

On February 16, 2007, Dethmers sent Ellis a letter stating:

Since November 2, 2006, you have refused to report to work, contending that the area within the Pewaukee Office in which you have been reassigned is "unhealthy" for you to work in. The mold and dust conditions that you contend exist have been disproved in the air quality testing that has been conducted in that office.

Your medical documentation was inadequate to support your position that your assigned area is "unhealthy" for you to work in. To ensure that we were not missing something medically, the Federal Occupational Health Physician talked to your doctor. Dr. Fink did not present any information that would support your inability to work in your assigned cubicle.

You currently occupy a permanent, full-time position that needs to be filled on a full-time basis. We cannot continue to, and it is not our policy to, maintain employees on our rolls who are unavailable for work. Therefore, you are instructed to report to duty immediately or provide specific medical documentation which states that you cannot report to the office. This is your last opportunity. Failure to report to work or to contact me by Monday, February 26, 2007, will result in adverse action, up to and including termination of your employment.

If you have any questions or concerns, please feel free to discuss them with me. The Employee Assistance Program, Occupational Health Services, is available to you 24 hours a day, 7 days a week, and the phone number is 1-800-977-7651.

You may apply for disability retirement by contacting a Benefits Specialist at 1-800-829-6007. If you choose to resign, your

resignation will not adversely affect you disability retirement application.

If you wish to resign your position, you may do so by completing the bottom portion of this letter and returning it in the enclosed envelope.

If you have any questions, please call me at 414-231-2404.

(Kiser Decl., Ex. 3, p. 30-32.)

On February 15, 2007, Ellis signed the first EEO Complaint in this case stating, in part, that the defendant refused to reasonably accommodate her disability, "which is severe allergies," by allowing plaintiff to work in a non-Red Area or from home. (Knepel Decl., Ex. 1, 6-10.) The EEO Complaint was received by the Treasury Complaint Mega Center in Dallas, Texas, on February 20, 2007. (*Id.*) Ellis's counsel submitted a letter from Dr. Jordan Fink dated February 23, 2007, stating, in part, that the carbon dioxide levels exacerbated plaintiff's symptoms and contribute to her "sick building syndrome," and requesting that plaintiff work in a non-Red area or at home. (*Id.*, at 310.) Dr. Fink stated in this letter:

> Stacy Ellis is a 42-year-old Tax Examiner who has been seen in my office since January 1999 for respiratory and other symptoms. Ms. Ellis has been diagnosed with allergies and has shown to be particularly sensitive to multiple molds, dust and pollen. Ms. Ellis has also made complaints of reactivity to perfume, air freshener and other airborne allergens.
>
> Ms. Ellis's allergies were accommodated from April 2002 until October 2003 by allowing her to work at home. She performed her work successfully and was assigned to the Blue Area of the Waukesha office in October 2003. While working at the Waukesha office, Ms. Ellis noted that she experienced mild symptoms while in the Red Area, but the symptoms were relieved once she left that area.

31

When Ms. Ellis was transferred to the Red Area of the Waukesha office her allergy symptoms returned almost immediately and persisted. She became congested, fatigued, had blurred thinking, swelling of her neck, and achy ears similar to ear infections. Ms. Ellis is again experiencing the same "sick building syndrome" symptoms that previously warranted assigning her to work at home. In this case, the solution is much less arduous because she need only be assigned to a non-Red Area of the Waukesha office.

I have also reviewed the results from an air quality test performed in the Waukesha office on November 21, 2006. The test reveal carbon dioxide levels well above 800 parts per million in all but one area and above 1000 ppm (ASHRAE limits) in other areas. Carbon dioxide levels in this amount likely have impaired air quality and would contribute to Ms. Ellis's condition. Her symptoms are exacerbated by these excessive carbon dioxide levels and contribute to her "sick building syndrome".

Ms. Ellis's symptoms are caused by her workplace and indicate an undeniable relationship between her condition and her work space. Ms. Ellis should be assigned to work at home or in a non-Red Area where I understand her work has been quite satisfactory. She has worked in a non-Red area for the past three years without experiencing these symptoms and this accommodation is a reasonable request. I am available to answer questions you have about Ms. Ellis's health condition or request for accommodation. My phone number is (414) 266-6840.

(Knepel Decl., Ex. 1, p. 310-11.) Ellis further described her symptoms as headache, achy ears, nasal congestion, fatigue, lightheadedness, sore throat, swelling of neck glands, inability to concentrate, and blurred thinking. (*Id.*, at 9, 39, 47-48, 230, 235, 258-59, 260, 310.)

On March 2, 2007, at the request of the Pewaukee Office landlord, Total Comfort of Wisconsin, Inc., a private company, performed a carbon dioxide test at the Pewaukee Office, and the test results reflect that the carbon dioxide levels recorded fell

below the IRS recommended levels of 1000 PPM for carbon dioxide. (*Id.*, at 294.) At cubicle number 18, the carbon dioxide level was 732 parts per million compared to cubicle 7 at 683 PPM. (*Id.,* at 294-296; Kiser Decl., Ex. 3, p. 33.) Moreover, the testing revealed that the readings may vary based upon whether the MUA unit which provided fresh air to the building is on or off; whether the fans on the heat pumps are turned to auto mode or constant fan; and whether occupancy of the space exceeds the original design criteria. (*Id.*)

From March 5 to March 14, 2007, follow-up testing for carbon dioxide, temperature, relative humidity, and carbon monoxide at the Pewaukee Office revealed that the average carbon dioxide levels did not exceed the American Society of Heating, Refrigerating, and Air Conditioning Engineers ("ASHRAE") recommended level. (*Id.*, 299-308.) The Time Weighted Average of recorded levels of $CO_2$ in red cubicle #18 during the test on March 5, 2007, between 9:00 a.m. and 5:00 p.m. was 872.8 and whereas the blue cubicle had a TWA level of 878.1. (*Id.*, at 305.) This test concluded that "the average $CO_2$ levels within the three areas occupied by the IRS did not exceed the ASHRAE 62.1-2004 recommended level of <700 PPM above the outdoor ambient concentration, or the GSA 8-hour time weighted average indicator of 1000 ppm. (*Id.*, at 299.)

On April 19, 2007, Kiser communicated the testing results to Dethmers. (Kiser Decl. Ex. 3, 33.) Dethmers advised Bischoff of Labor Relations to proceed with the termination because 960 AWOL hours had accumulated and on August 24, 2007, Bischoff forwarded the proposed removal letter to Dethmers. (*Id.,* at 35, 42.)

33

On August 30, 2007, Ellis was issued a notice proposing her removal from the IRS because she was unavailable for duty when she failed to report to Milwaukee on October 16, 2006; medical documentation was not sufficient to substantiate her absence from the Milwaukee Office; she failed to report for duty in Pewaukee on January 16, 2007; she had been advised that the air quality testing revealed no health hazards; she failed to follow proper leave procedures; and she was charged AWOL on multiple occasions between October 16, 2006, through August 2, 2007. (Guillot Decl. ¶ 6, Ex. 2)

On September 18, 2007, Ellis, through her attorney, submitted a response. (*Id*., at ¶ 9.) Seven days later, Bruce Dethmers recommended in a Memorandum to Darren Guillot, the Area Director, that Ellis's employment with the IRS be terminated. (*Id*., at ¶ 8.) Dethmers's memorandum summarized Ellis's response and stated that Ellis's reply did not submit any new information or issues. (*Id.,* at Ex. 3.)

Dethmers's September 25, 2007, memorandum added:

> Management made efforts to be responsive to the employee's issues as they were presented. Ms. Ellis pursued Reasonable Accommodation through our DEO Office but it was denied as the medical information did not support the accommodation request. The medical information did not provide sufficient information to sustain the position that Ms. Ellis could not work in the "Red Area" of the Pewaukee office. The air quality testing did show some areas throughout the building where carbon dioxide was high. However, the level of carbon dioxide was not toxic and the air intake was adjusted to reduce the levels below the requirements. The employee still refused to come to work. The Milwaukee air freshener situation was unfortunate as the individual did not know that Ms. Ellis had allergies or that she was going to sit near her office that day. Management did immediately move Ms. Ellis to a workstation far on the other side of the office as soon as Ms. Ellis advised us of her concern. Soon after, she advised us she was allergic to the adhesive or formaldehyde used to install the carpeting. Subsequently, management learned that no formaldehyde was

34

used in making the carpet and that the adhesive used was an approved "green product".

No new information was presented in the Written Reply, so I believe that Management has all the information that is available to consider with this matter. Ms. Ellis, though her representative, indicates that she is unable to work in the Red Area of the building. She is able to work in the Blue or Green areas of the building, even though both of those areas had some spots with high carbon dioxide too. Management has made extensive efforts to ensure that Ms. Ellis has a safe and clean workstation in the Red Area in which to work, but no matter what is done, she still refuses to come to work in that part of the building. As a result, it is still my recommendation that we proceed to terminate Tax Examiner Stacy Ellis for the three reasons outlined in my proposal letter.

(Guillot Decl. ¶ 8, Ex. 3.)

Guillot made the decision to terminate Ellis's employment on the basis of Dethmers's September 25, 2007, memorandum that identified four specifications when Ellis was not available for duty; that she was charged with AWOL 21 times; that she failed to follow proper leave procedures; that air quality testing conducted on both the Pewaukee Post of Duty, as well as the Milwaukee Post of Duty revealed no health hazards; that mold and dust levels at the Posts of Duty were well below acceptable levels; that the medical information provided by Ellis was provided to the FOH along with the results of the air quality testing; and that Dr. James W. Allen, FOH Certified Independent Medical Examiner, discussed the situation with Ellis's physician and found no medical basis for the claim that the work environment was unhealthy. (Guillot Decl. ¶ 10.) Guillot did not review any documents reflecting that Ellis had a substantially limiting impairment, and further noted that the letters from Ellis's doctor were unspecific in fully stating her disability. (Guillot Decl. ¶ 12.)

Guillot did not regard Ellis as disabled when he made the decision to terminate her employment. (Guillot Decl. ¶ 12.) Moreover, he has not supervised any other employees who refused to report for duty because of allergies or sick building syndrome. (Guillot Decl. ¶ 12.) Further, neither Kiser nor Dethmers considered Ellis disabled. (Kiser Decl., Ex. 2, p. 10; 61.) Kiser did not supervise any other employees who complained of the problems described by Ellis and none of Kiser's other employees had been changed with AWOL and terminated. (*Id.*, at 9-10.) Dethmers also did not supervise other employees with similar health problems as Ellis. (Knepel Decl., Ex. 1, 61.)

On October 10, 2007, Ellis was notified that she would be removed from her position effective October 19, 2007. (Guillot Decl. ¶ 11.) At the time of her termination, Ellis was a Grade 6, Step 10 employee, earning $42,900. (Knepel Decl., Ex. 3, 449.) On January 3, 2008, Ellis filed a second complaint of discrimination alleging that she was terminated because of her disability and in retaliation for prior EEO activity. (Knepel Decl., Ex. 3, 549-552.)

Since January 2008, Ellis has been employed part time by ProHealth Care as a secretary/technician in the Physical Therapy and Rehabilitation Department. (Ellis Dep. 8-9.) Her duties at ProHealth Care include working with patients and the physical therapist. (*Id.*, at 9.) While working for ProHealth Care, in the winter of 2008, Ellis started feeling lightheaded, had a headache and didn't feel like herself. (*Id.,* at 19.) Ellis believed that mold was causing her reaction; however, when the area was tested for mold, none was reported. (*Id.*, at 20.) Because she was only at the facility a minimal amount of time, and felt that her reaction "is also dependent on what is going on in the building, the weather, humidity, that kind of thing," she continued to work in the building. (*Id.*, at 21.)

36

Ellis experienced a similar reaction in the summertime of 2008 at the New Berlin building. (*Id.,* at 26.) She had another reaction in 2008/2009, on a humid day, when she went to a neighbor's house where there had been a cat approximately two years prior. (*Id.*, at 25.) Ellis described her reaction as congestion in her nose, scratchiness in her throat, but not "drastic." (*Id.*, at 25.) She also experienced a runny nose in a closet at the Hartland clinic. (*Id.*, at 34.) Her symptoms stopped when she left the closet and went home. (*Id.*)

Ellis believes that when she moved into her house, she was allergic to the carpeting. (*Id.*, at 30.) Her symptoms were that she did not feel herself; she felt foggy. (*Id.*, at 31.) She opened the windows and in about a month, her allergy diminished. (*Id.*) Ellis also states that she is allergic to perfumes, colognes and floral scents. (*Id.*, at 33.) She only goes to Bath and Body for a limited amount of time because it has a very strong flora scent. (*Id.*, at 34.) Ellis does not go to soap stores because she knows that she will have an allergic reaction. (*Id.*) She also does not go down the soap aisle in the grocery store or anywhere there is a very strong scent except for a limited time. (*Id.*, at 35.) Sometimes Ellis eats out, however, she has not had an allergic reaction in a restaurant. (*Id.*, at 35.) Canned frosting makes her feel an itchiness on her back. (*Id.*, at 35.) Baths make Ellis itchy, so she takes showers. (*Id.*, at 37.)

Ellis goes to movie theaters, and she has not had an allergic reaction while in a movie theater. (*Id.*, at 35.) She has not had an allergic reaction while driving her car. (*Id.*, at 36.) Her allergies do not limit her ability to prepare meals, and she is able to clean the bathrooms in her house, vacuum, dust, and wash the floors. (Id., at 38) She uses vinegar, ammonia, Soft Scrub, and Clorox Clean-up to clean, wears gloves and is

Case 2:08-cv-00436-CNC   Filed 06/21/10   Page 37 of 49   Document 50

concerned about the smell of bleach, but has not had an allergic reaction to Clorox.  (*Id.*, at 3-39.)

Because Ellis feels that her garage is dusty, salty, and dirty, her husband has to clean it once a year.  (Ellis Tr. 42-43.)  The garage is the only area where her allergies limit her ability to clean.  (*Id.*, at 42.)  Cleaning the garage involves taking everything out of it and sweeping it.  (*Id.*)  She and her husband try to clean the house once every two weeks.  *(Id.,* at 43.)  The basement is cleaned once or twice a year, and her husband does that.  (*Id.*)

Ellis uses a 100 percent cotton quilt on her mattress because polyester makes her sweat and feel itchy, and she washes it once a month.  (*Id.*, at 44.)  Her sheets have the highest thread count and her pillow cases are covered so that she can wash them on a regular basis.  (*Id.*)  Ellis uses hot water to wash the bedding and has never used fabric softener because she is fearful that will be an irritant to her skin.  (*Id.*, at 39.)

She uses Dove Unscented for Sensitive Skin and Aveda Shampure shampoo.  (*Id., at 40.*)  Ellis has her hair colored at a salon.  (*Id.*, at 41.)  After an allergic reaction to Aveda hair color, she changed salons.  (*Id.*, at 41.)  Approximately four or five years prior, Ellis had an itchy scalp in reaction to hair coloring.

Ellis experiences a runny, stuffy nose, sneezing, as well as a headache that affects her thinking when she visits her grandmother's home once a year.  (*Id.*, at 44-45.)  Other than her inhaler, Ellis does not use any medications to control her allergies because she has removed herself from the environment and is no longer experiencing allergic reactions.  (*Id.*, at 45.)

38

Ellis is able to drive a car without allergic reactions. (*Id.*, at 35.) When she removes herself from an environment that is causing her problems, her reaction diminishes, and goes away eventually. (*Id.,* at 45.) A number of years ago, she used Claritin to minimize the symptoms of her allergies. (*Id.*, at 46.) She is able to exercise four to five times a week for forty-five minutes to an hour. (*Id.*, at 191.) Ellis walks on a treadmill, does aerobics, yoga, Pilates, weight lifts, and rides her bike when the weather is nice. (*Id.*, at 191.)

Ellis has made the following statements regarding her inability to work in the Red Area of the Pewaukee Office:

- "The symptoms limit my ability to work in the Red Area of the [Pewaukee] building." (Knepel Decl., Ex. 1, p. 40);

- "I am being reported AWOL because my disability prevents me from working in the Red Area of the Waukesha office." (Knepel Decl., Ex. 1, 44);

- "My recent specific prognosis and all the previous documentation of my health condition indicate that I am unable to work in the Red Area of the Waukesha building and has not been considered by management or EEO. (Knepel Decl., Ex. 1, p. 44);

- "My recent specific prognosis of my health condition that prevents me from working in the Red Area of the building has not been considered by management or EEO. (Knepel Decl., Ex. 1, p. 49).

Ellis has not requested Social Security Disability benefits because she does not feel it is necessary to do so. (Ellis Dep. 190.)

CONCLUSIONS OF LAW

Federal employees alleging employment discrimination based on a disability may proceed under the Rehabilitation Act. 29 U.S.C. § 794(a). The Rehabilitation Act and the Americans with Disabilities Act, were amended significantly, effective January 1, 2009. ADA Amendments Act of 2008, Publ. L. No. 110-325 (2008). However, Congress expressed no intent that the amendments be effective retroactively. The Seventh Circuit has held that, in the absence of such intent, the law in place prior to the amendments governs cases that pre-date the amendments. *Fredricksen v. UPS*, 581 F.3d 516, 521 n. 1 (7th Cir. 2009). Accordingly, the court will apply the statute, regulation, and laws in place prior to the amendment.

Ellis argues that she has established a prima facie case of discrimination with evidence that: (1) she suffers from a disability as defined in the Act; (2) she is qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) she has suffered an adverse employment decision because of her disability. *Garg v. Potter,* 521 F.3d 731, 736 (7th Cir. 2008). The burden then shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the adverse employment action." *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 503 (7th Cir. 2004). If defendant provides such a reason, Ellis must then show that the reason was merely pretext for discrimination. *Id.*

The Act defines "disability" as: (1) a physical or mental impairment that substantially limits one or more of her major life activities; (2) a record of such a disability; or (3) being regarded as having such an impairment. 29 U.S.C. § 705(20)(B); see *Duncan*

40

*v. Wis. Dep't of Health & Family Services*, 166 F.3d 930, 935 (7th Cir.1990). "Substantially limited" means "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." *EEOC v. Sears Roebuck & Co.*, 417 F.3d 789, 797, 800 (7th Cir. 2005). When working is the major life activity at issue, it is not enough for a plaintiff to show that her impairment keeps her from doing a particular job; an impairment does not substantially limit the major life activity of working unless the condition prevents the plaintiff from performing "a broad range of jobs" in various classes as compared to the average person having comparable training, skills and abilities. 29 C.F.R. § 1630.2(j)(3)(I); *see E.E.O.C. v. Schneider National, Inc.*, 481 F.3d 507, 511 (7th Cir. 2007), *quoting Toyota Motor Mfg., Inc. v. Wiliams*, 534 U.S. 184, 200, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002).

    Here, Ellis has not established that she is substantially limited in her ability to work, exercise, socialize, or otherwise engage in a major life activity, has a record of such disability, or that she is otherwise regarded as having such impairment. She maintains that she was diagnosed with a disability in 2002 and that allergy tests at that time were positive for molds, pollen, dust, and cat. Ellis cites three letters written by her physician, Dr. Fink, in 2006 and 2007 requesting a reasonable accommodation for her. In addition, she cites the following symptoms of her allergies: nasal congestion, sore throat, achy ears, swelling of the neck glands, headaches, inability to concentrate and blurred thinking. According to Ellis, Kiser classified her as having "severe allergies." Ellis maintains that there are no medications to alleviate her symptoms and that her allergies

Case 2:08-cv-00436-CNC   Filed 06/21/10   Page 41 of 49   Document 50

are permanent. She further claims that she is precluded from working in a wide range of jobs.

With respect to working, there is no evidence that she is restricted in her ability to perform a class of jobs or broad range of jobs in various classes as compared to the average person having comparable training. For example, Dr. Fink testified that Ellis would develop additional problems if she were to work in a bakery. In addition, Ellis's vocation expert, John Woest, concluded:

> If I were a vocational rehab. counselor working with her and developing a rehabilitation plan for her, my primary focus would be to find something that works for her and keep her there. Because, again, that would control – similarly to her current household situation, she can control that environment so she's okay there. But that's the problem, you just don't know what's going to end up happening, and if she does find someplace – I think that's one of the reasons why she wants to stay where she's at right now, because she's able to function pretty well. But, yeah, that's – that would definitely be an issue from my standpoint, it would be a choice on her standpoint, but if I were going to help her with the voc. rehab plan, I would want her to focus in on something specific that she could stay at that worked for her.

(Allen Aff., Ex. 14, 42-43.) He further opined that any work restriction is environmental rather than physical. (*Id.*) Based on this testimony and evidence, Ellis's attorney asserts that it is "reasonable for us to conclude that Ms. Ellis would be precluded from working in other predictably hazardous environments such as a paper mill or saw mill where dust is regularly in the air." (Pl.'s Br. in Opp., 8.)

Nothing in this record establishes that Ellis, who has a high school diploma, would be qualified to work as a baker, in a paper mill, or other "predictably hazardous environments" or that she would pursue these jobs if they were available. On the other

Case 2:08-cv-00436-CNC   Filed 06/21/10   Page 42 of 49   Document 50

hand, Ellis has found and maintained employment as secretary/technician for ProHealth Care in the Physical Therapy and Rehabilitation Department since leaving the IRS.

Further, Ellis argues that she is substantially limited in socializing because she is unable to visit her grandmother's home because of the dusty boxes, she has had to leave football games before they end due to the grass, and she is unable to shop in stores with strong scents or shop the detergent aisle in grocery aisle. If she makes travel plans, she and her family must remain flexible in case they need to change rooms or change hotels because of her allergic reactions. Ellis is precluded from volunteering for committees related to her son's school because the meetings are held in the homes of people who have or have had animals, or other conditions that may cause a reaction.

Notwithstanding, Ellis is able to exercise four to five times a week for forty-five minutes to an hour and is able to walk on the treadmill, do aerobics, yoga, Pilates, weight lighting and ride a bike outdoors. Socially, she eats in restaurants, goes to the theater, drives her car, goes on vacation (while remaining flexible), goes to the salon to get her hair colored, goes grocery shopping. In addition, she cleans her house (except the garage), uses chemical cleaning agents, and works in a job where she interacts with other employees and patients. Ultimately the question is whether Ellis's condition, not the occasional flare-up, is disabling. *See Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 952 (7th Cir. 2000). Thus, Ellis has failed to come forward with sufficient evidence that a permit a reasonable jury to conclude that she had a disability or record of disability that substantially limited a major life activity.

Had Ellis made a prima facie case of disability discrimination, she would still have to show that her employer's legitimate non-discriminatory reasons for terminating her

43

were pretextual. To this end, she claims that she would not have been AWOL had she been allowed to remain in the blue area. Yet in determining whether the decision was pretextual, the court does not assess whether that decision was correct, but whether Ellis has presented enough evidence to show that the articulated reason was a lie. *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). "It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused, or otherwise benighted; none of those possibilities violates federal law." *Yindee v. CCH Inc.*, 458 F.3d 599, 602 (7th Cir. 2006)(citing *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416 (7th Cir. 2006) (collecting authority).

Ellis provided documentation, albeit dated, that at some point she tested positive to dust, molds, pollen, and cat. However, the agency's testing revealed that molds and dust were well below an acceptable level. In addition, the carbon dioxide levels in the red cubicle were below the GSA standard of 1000 PPM and there is no evidence that any particular level of carbon dioxide triggered Ellis's symptoms.

Ellis suggests that the defendant's reasons for refusing to accommodate her are pretextual inasmuch as Kennedy did not give Dr. Allen a copy of the 2002 allergy test and that Kiser told her to go home if she felt sick on the first day of work in cubicle # 18. However, Ellis was told that she needed to submit current medical information. Moreover, Dr. Allen was clearly aware of the 2002 allergy test because he referenced it in his communication with the defendant. In addition, Kiser's statement came at a time when Ellis was refusing to sit in cubicle # 18 on the only day of work in that area. These facts do not establish pretext and Ellis's discrimination claim fails on this record.

44

Defendant also seeks summary judgment on the retaliation claim. The ADA anti-retaliation provision provides that:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

The direct method of proof requires Ellis to show evidence of: "(1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two." *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 788 (7th Cir. 2007) *(citing Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006)). To prove the causal connection, "the plaintiff is required to show that the employer would not have taken the adverse action 'but for' the plaintiff's engagement in the protected activity." *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996). The most common manner of establishing a casual link between an adverse employment action and an employee engaging in protected activity is to show that the adverse action came on the heels of the protected activity. *See Filipovic v. K & R Exp. Systems, Inc.*, 176 F.3d 390, 399 (7th Cir. 1999). Yet a substantial time lapse between the events is counter-evidence of a causal connection. *Id.*

Viewing the facts in the light most favorable to the nonmoving party, Ellis can establish that she engaged in a statutorily protected activity and that she suffered an adverse employment action. However, she has not come forward with proof of a causal connection. She seems to believe that it is sufficient that Guillot was aware that she filed a reasonable accommodation request and that the managers who recommended her

45

termination were aware that she filed an EEO complaint. However, "the mere fact that one event preceded another does nothing to prove that the first event caused the second; the plaintiff also must put forth other evidence that reasonably suggests that [his] protected speech activities were related to [his] employer's discrimination." *Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007) (*quoting Burks v. Wis. DOT*, 464 F.3d 744, 758-59 (7th Cir. 2006)). Mere knowledge, by itself, does not establish a retaliatory motive for an employer's action. *Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir.1999).

Ellis made her request for reasonable accommodation in September of 2006. She was terminated by Guillot over *one year later* in October of 2007. *See*, *e.g., Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010). Moreover, she told Kiser in January of 2007 that she filed a complaint with the EEO Counselor but was not terminated until October of 2007. This is not a case where the termination followed on the heels of knowledge.

Nor is this a case where the plaintiff has come forward with any other circumstantial evidence such as written or oral statements. Ellis cites a comment by Kiser in November of 2006 referring to Ellis's continued documentation of her reasons for not coming to work suggesting "Probably this time she thinks we will really, really listen to her." That statement, which is taken out of context, appears in an e-mail chain on November 14, 2006. Hence, it was before the first EEO complaint was received and almost a year before Ellis was terminated. More important, the statement was in response to Dethmers, who had commented: "We already knew that! I wonder why she felt compelled to tell us again?" Kiser responded: "Probably because this time she thinks we will really, really listen to her. I stopped down after our 2nd interview to see Dorothy but she wasn't in. I'll try later.

46

I want our next letter proposing suspension out by tomorrow at the latest." This evidence does not suggest that defendant would not have taken the adverse action but for Ellis engaging in a protected activity. As such, her claim fails under the direct method.

Under the indirect method, Ellis must prove that (1) she engaged in statutorily protected activity; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008). As discussed above, Ellis has established that she engaged in statutorily protected activity and her termination was an adverse employment action.

Nevertheless, Ellis has not established that she met her employee's legitimate expectations because she did not properly support her Reasonable Accommodation Request. She relied entirely on a 2002 letter, two pages of test results and an unsigned medical release form. While she later provided her doctor's October 5, 2006, letter, she did not address the impact of her condition on major life activities or the anticipated duration of her medical condition as requested by the form.

Ellis believes that she was meeting her employer's legitimate expectations and that her employer failed to engage in an interactive process to accommodate her allergies. For example, she claims that she was not provided with carbon dioxide test results prior to her termination and that she was not told that "green" products were used in the carpeting in the Milwaukee office.

Ellis's arguments are curious insofar as she never requested carbon dioxide testing, the carbon dioxide testing revealed that it was within the GSA's carbon dioxide

Case 2:08-cv-00436-CNC   Filed 06/21/10   Page 47 of 49   Document 50

standard of 1000 parts per million, she never informed her employers that she is sensitive to carbon dioxide at levels below the standard, and her doctor has testified that he did not know what level of carbon dioxide would trigger her symptoms. (Fink Dep. 20.) Cubicle 18, at the center of this controversy, had a carbon dioxide level of 891 ppm.

Defendant took a number of steps to accommodate Ellis, yet she still failed to report to work. Ellis's doctor requested that the defendant test for molds and dust. Defendant tested and reported that "mold and dust levels were well below acceptable levels: and that testing "revealed no health hazards." In addition, Ellis was asked to work temporarily in Milwaukee but refused to report. When she did, she complained of formaldehyde that did not exist.

In October of 2006, Ellis said that she was able to work in the blue area of Post of Duty because of a vent above her head blowing in fresh hair. Kiser offered to redirect the airflow but Ellis backed off her earlier statement that the fresh air was a solution. Repeatedly, Ellis refused the accommodations that were offered and refused to report to work. There is no genuine issue of material fact that would require this element to be decided by a jury.

Even if Ellis were meeting her employer's legitimate expectations, there is no evidence that she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. To be similarly situated, employees must be "directly comparable in all material respects." *Hudson v. City of Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). Ellis points to Teresa Memmel, a Revenue Officer in the same office, who requested and received a leave and a specialized keyboard for arthritis. In addition, Memmel and other unidentified IRS employees complained about a cleaning

48

product and the use of the product was discontinued.  However, there is nothing in this record that suggests that Memmel, Ellis or the unidentified employees have "sufficient commonalities on the key variables" to allow a jury to infer retaliation.  *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).  Furthermore, it does not appear that the alleged comparators held the same position, submitted a request lacking documentation, or otherwise failed to report to work.

The court is limited to the record, and the undisputed evidence in this record is that Kiser did not have any other employees with similar problems, and never had an employee charged with AWOL and terminated.  Dethmers had never supervised anyone with similar health problems.  Moreover, Guillot, the Area Director, who made the decision to fire Ellis, never had any other employee complaining of allergies or sick building syndrome.  Consequently, Ellis has failed to establish a prima face case of retaliation, the defendant has established entitlement to summary judgment and judgment has been granted.  Now, therefore,

IT IS ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 21st day of June, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE